POTOMAC PASSENGERS ASSOCI-
ATION, Plaintiff,

v.

CHESAPEAKE AND OHIO RAILROAD COMPANY and Baltimore and Ohio Railroad Company, Defendants.

Civ. A. No. 842-71.

United States District Court, District of Columbia.

Aug. 3, 1973.

Pierre E. Dostert, Washington, D.C., for plaintiff.

Robert O. Smith, Jr., Baltimore, Md., for defendants.

## MEMORANDUM AND ORDER

CORCORAN, District Judge.

This action is before the Court on remand from the Court of Appeals, 475 F. 2d 325, to enter a declaratory judgment pursuant to 28 U.S.C. § 2201 (1970), as to whether the operation of certain trains by the defendant Baltimore & Ohio Railroad (B&O) prior to May 1, 1971, and discontinued since that date, constituted "intercity" passenger service within the meaning of Section 401 (a)(1) of the Rail Passenger Service Act of 1970 (Amtrak Act), 45 U.S.C. § 501 et seq. (1970), or, to the contrary, whether such service was "commuter" or "short-haul service" within the meaning of Section 102(5) of the Amtrak Act. If the former, i. e., "intercity," the B&O could have legally discontinued such service under the Amtrak Act after complying with the notice provisions of that Act, which the B&O did; but if the latter, i. e., "commuter," the B&O could not have discontinued such service except with the sanction of the Interstate Commerce Commission (I.C.C.) 49 U.S. C. § 13a (1970), and the state regulatory agencies of the states through which the trains passed.

The trains in question are:

| Train Nos. | Leave | Arrive | Distance In Miles |
|---|---|---|---|
| 5 | Washington, D.C. 4:40 p. m. | Chicago, Ill. 9:05 a. m. | 770 |
| 6 | Chicago, Ill. 3:50 p. m. | Washington, D.C. 10:00 a. m. | 770 |
| 8 | Akron, Ohio 6:55 a. m. | Washington, D.C. 7:00 p. m. | 416 |
| 11–7 | Washington, D.C. 8:05 a. m. | Akron, Ohio 6:40 p. m. | 416 |
| 12 | Cumberland, Md. 7:00 p. m. | Washington, D.C. 10:40 p. m. | 544 * |
| 17 | Washington, D.C. 9:00 p. m. | Cumberland, Md. 12:10 a. m. | 146 |
| 33 | Washington, D.C. 2:30 p. m. | Cumberland, Md. 5:45 p. m. | 146 |
| 34 | Cumberland, Md. 6:00 a. m. | Washington, D.C. 9:12 a. m. | 146 |
| 35 | Washington, D.C. 12:01 p. m. | Cumberland, Md. 3:15 p. m. | 146 |

\* Originated at Cincinnati, Ohio.

Trains 5, 6, 8 and 11–7 all passed through Cumberland, Maryland and, between Washington, D.C., and Cumberland, Maryland, all trains in question offered service to passengers to and from Silver Spring, Maryland, Harpers Ferry and Martinsburg, West Virginia.[1]

The plaintiff, Potomac Passengers Association (Potomac Passengers), is a voluntary association of persons who formerly used the trains in question, to and from points between Washington, D.C. and Cumberland, Maryland. The association asserts that the operation was a "commuter" service. The defendants counter that the trains were "intercity."

---

[1]. The discontinuance of the nine trains in question does not deprive such passengers of all commuter service. B&O runs two commuter trains each weekday, each way between Brunswick, Maryland, and Washington, D.C. It also provides one commuter train each weekday, each way between Washington, D.C. and Martinsburg, West Virginia. And Amtrak presently provides one commuter train daily each way between Cumberland, Maryland, and Washington, D.C.

After remand, this Court, by order of April 25, 1973, referred this matter to the I.C.C. for findings and an advisory opinion pursuant to 28 U.S.C. § 1332(b) (1970). The parties submitted briefs to the I.C.C. The I.C.C. issued its opinion June 25, 1973, in Mavis Kennedy v. The Baltimore and Ohio R.R. Co., Finance Docket No. 26689,[2] appended hereto as Appendix A.

The I.C.C. approached the case by considering six criteria of commuter service which it had theretofore applied on five separate occasions.[3]

Those criteria of commuter service as devised by the I.C.C. are these:

(1) The passenger service is primarily being used by patrons traveling on a regular basis either within a metropolitan area or between a metropolitan area and its suburbs;

(2) The service is usually characterized by operations performed at morning and evening peak periods of travel;

(3) The service usually honors commutation or multiple-ride tickets at a fare reduced below the ordinary coach fare and carries the majority of its patrons on such a reduced fare basis;

(4) The service makes several stops at short intervals either within a zone or along the entire route;

(5) The equipment used may consist of little more than ordinary coaches;

(6) The service should not extend more than 100 miles at the most, except in rare instances; although service over shorter distances may not be commuter or short haul within the meaning of the exclusion.[4]

After full consideration of the various criteria as they related to the trains in question, the Commission found that the nine trains in question were "intercity" and not "commuter or other short-haul service in metropolitan and suburban areas" as that language is used and applied in the Amtrak Act, 45 U.S.C. § 501 et seq. (1970).

Following receipt of the advisory opinion, Potomac Passengers submitted a brief in opposition,[5] and argument was had.

■ The advisory opinion of the I.C. C. is, of course, not binding upon the Court. After independent consideration of the briefs, the arguments and the advisory opinion of the I.C.C., however, the Court finds that the criteria applied by the I.C.C. conformed to the standards of the Amtrak Act, 45 U.S.C. § 502(5), and that the findings and conclusions are amply supported by the record. This Court accordingly adopts the I.C.C. findings of fact and conclusions of law as its own. In so doing, the Court places great reliance on the I.C.C.'s administrative expertise and the necessity for a uniform application of national policy in cases of this nature.

The Court accordingly enters its declaratory judgment this 3rd day of August, 1973, that the operation of the trains in question constituted intercity service within the meaning of Section 401(a)(1) of the Rail Passenger Service Act of 1970, 45 U.S.C. § 501 et seq. (1970) and that the defendant Baltimore

---

2. The case takes its title from a complaint filed with the I.C.C. in June, 1971 wherein these same complainants alleged that B&O had illegally discontinued operation of the trains because it had not filed notice of discontinuance under Sec. 13a(1) of the Interstate Commerce Act. By order of January 26, 1972, the I.C.C. found no violation of the Act and dismissed the complaint. The complainants then launched their attack under the Amtrak Act. The I.C.C. docket was reopened when the request for an advisory opinion was made by the Court.

3. Penn Central Transp. Co. Discon, or Change in Serv., 338 I.C.C. 318 (1971); Chicago & E. I. R. Co. Discontinuance of Trains, 338 I.C.C. 714 (1971); Penn Central Transp. Co.—Status of Passenger Serv., 338 I.C.C. 621 (1971); Penn Central Transp. Co.—Status of Passenger Serv., 338 I.C.C. 660 (1971); and Penn Central Transp. Co.—Status of Passenger Serv., 338 I.C.C. 690 (1971).

4. I.C.C. Opinion, Appendix A, *infra* at 45.

5. B&O relied upon its brief before the I.C.C.

& Ohio legally discontinued the same after compliance with the statutory notice provisions of the Act.

It is so ordered.

## APPENDIX A

### INTERSTATE COMMERCE COMMISSION
### SERVICE DATE
### JUNE 27, 1973

Finance Docket No. 26689

### MAVIS KENNEDY V. THE BALTIMORE AND OHIO RAILROAD COMPANY

*Decided June 25, 1973*

Found, pursuant to the order of the United States District Court for the District of Columbia, dated April 25, 1973, referring the matter herein to this Commission, that The Baltimore and Ohio Railroad Company train Nos. 5, 6, 8, 11–7, 12, 17, 33, 34, and 35, provided "intercity" and not "commuter or other short-haul service in metropolitan and suburban areas" as that language is used and applied in the Rail Passenger Act of 1970, 45 U.S.C. 501 et seq. Proceeding dismissed for lack of jurisdiction.

*Mavis Kennedy* for complainant.

*Pierre E. Dostert* for Potomac Passengers Association.

*Robert O. Smith, Jr.* for defendant.

### REPORT OF THE COMMISSION
### BY THE COMMISSION:

This proceeding is currently before this Commission as a result of an order of referral issued April 25, 1973, by the United States District Court for the District of Columbia. This order was issued pursuant to Title 28 U.S.C. Section 1332(b), and seeks to have this Commission investigate and prepare an advisory opinion determining whether certain trains[1] formerly operated by the Baltimore and Ohio Railroad Company (hereinafter referred to as Baltimore and Ohio, or defendant) provided "intercity" or "commuter or other short-haul service in metropolitan and suburban areas" as this terminology is used in the Rail Passenger Service Act of 1970 (hereinafter referred to as Amtrak), 45 U.S.C. § 501 et seq.

Upon receipt of the order of the court the Commission issued its own order dated April 27, 1973, in which the previous order regarding this proceeding, dated January 26, 1972, was vacated, and the proceeding was reopened for further consideration. Parties were given 15 days to submit any additional verified statements and arguments they wished. Additional statements and briefs were received from Mavis Kennedy (hereinafter referred to as complainant), Potomac Passengers Association (hereinafter referred to as co-complainant) and defendant. No requests for oral hearing were made.

### BACKGROUND

This proceeding originally came to the Commission as the result of a complaint

[1]

TABLE I

| TRAIN NOS. | TERMINI | DISTANCE IN MILES |
|---|---|---|
| 5 | Washington, D.C.— Chicago, Ill. | 770 |
| 6 | Chicago, Ill.— Washington, D.C. | 770 |
| 8 | Akron, Ohio— Washington, D.C. | 416 |
| 11–7 | Washington, D.C.— Akron, Ohio | 416 |
| 12 | Cincinnati, Ohio— Washington, D.C. | 544 |

TABLE I—Cont'd

| TRAIN NOS. | TERMINI | DISTANCE IN MILES |
|---|---|---|
| 17 | Washington, D.C.— Cumberland, Md. | 146 |
| 33 | Washington, D.C.— Cumberland, Md. | 146 |
| 34 | Cumberland, Md.— Washington, D.C. | 146 |
| 35 | Washington, D.C.— Cumberland, Md. | 146 |

filed June 23, 1972, in which complainant alleged that Baltimore and Ohio unlawfully discontinued its train Nos. 5, 6, 8, 11–7, 12, 17, 33, 34, and 35, because it failed to file with the Interstate Commerce Commission a notice of discontinuance under section 13a(1) of the Interstate Commerce Act. The defendant maintained that these trains were intercity trains as that term is used in the Amtrak Statute and thus exempt from Commission jurisdiction as provided in section 401(a)(1) of the statute. 84 Stat. 1334, 45 U.S.C. § 561.

This Commission by its report and order of January 26, 1972, found that "no violation of the Interstate Commerce Act has been committed and that [it has] no jurisdiction to order said trains restored to service." 342 I.C.C. 19, 22 (1972).

The single issue before the Commission at this time is whether the 9 trains referred to above provided "intercity" service or "commuter and other short-haul service in metropolitan and suburban areas" as the terms are used in the Amtrak Statute. 84 Stat. 1328; 45 U.S.C. § 501 et seq.

## PERTINENT FACTS

Baltimore and Ohio operated the 9 trains in question until May 1, 1971, at which time defendant, having entered into a contract, April 16, 1971, with the National Railroad Passenger Corporation (NRPC), was relieved from responsibility for the continuation of any intercity rail service. 84 Stat. 1334; 45 U.S.C. § 561. The trains involved herein were not designated for continuation by NRPC and accordingly were discontinued. As can be seen by referring to footnote No. 1, five of the trains traversed lines in excess of 400 miles.[2] The four remaining trains traveled between Washington, D.C. and Cumberland, Maryland, a distance of 146 miles.

The schedules under which these trains operated were:

TABLE II

| TRAIN NOS. | LEAVE | ARRIVE |
|---|---|---|
| 5 | Washington, D.C. 4:40 p. m. | Chicago, Ill. 9:05 a. m. |
| 6 | Chicago, Ill. 3:50 p. m. | Washington, D.C. 10:00 a. m. |
| 8 | Akron, Ohio 6:55 a. m. | Washington, D.C. 7:00 p. m. |
| 11–7 | Washington, D.C. 8:05 a. m. | Akron, Ohio 6:40 p. m. |
| 12 | Cumberland, Md.[3] 7:00 p. m. | Washington, D.C. 10:40 p. m. |
| 17 | Washington, D.C. 9:00 p. m. | Cumberland, Md. 12:10 a. m. |
| 33 | Washington, D.C. 2:30 p. m. | Cumberland, Md. 5:45 p. m. |
| 34 | Cumberland, Md. 6:00 a. m. | Washington, D.C. 9:12 a. m. |
| 35 | Washington, D.C. 12:01 p. m. | Cumberland, Md. 3:15 p. m. |

Statistics were presented by both sides as to what percentage of the total passengers could be classified as commuters. Baltimore and Ohio presented the following:

| Train No. | Percentage |
|---|---|
| 5 | 22.9% |
| 6 | 2.2% |
| 8 | 4.1% |
| 11–7 | 1.9% |
| 12 | 2.8% |
| 17 | 35.7% |
| 33 | 43.2% |
| 34 | 60.2% |
| 35 | 10.6% |

They further showed the following which represents commuter tickets as a percentage of total passenger revenues:

| Train No. | Percentage |
|---|---|
| 5 | 2.0% |
| 6 | 0.1% |
| 8 | 0.8% |
| 11–7 | 0.4% |
| 12 | 0.5% |
| 17 | 14.8% |
| 33 | 20.2% |
| 34 | 37.0% |
| 35 | 4.5% |

2. Train Nos. 5, 6, 8, 11–7, and 12.

3. Train originated at Cincinnati, Ohio.

Using statistics for the first four months of 1971, Potomac Passengers Association derived these percentages of commuter and other short-haul passengers:

| Train No. | Between Washington, D. C. Martinsburg, W. Va. | Washington, D. C. Cumberland, Md. |
|---|---|---|
| 5 | 26.30% | — |
| 6 | 30.07% | — |
| 8 | 59.96% | — |
| 11–7 | 45.12% | — |
| 12 | 49.46% | — |
| 17 | 72.82% | 100% |
| 33 | 82.70% | 100% |
| 34 | 92.01% | 100% |
| 35 | 82.20% | 100% |

Reduced fares were offered for all the involved trains on points between Cumberland, Maryland, and Washington, D. C., and including Cumberland, prior to April 26, 1970. The figures presented by Baltimore and Ohio represent the percentage of passengers utilizing these reduced fare tickets. The co-complainants' statistics represent all passengers riding between Washington and Martinsburg, W. Va., including those who paid full fare. Also train Nos. 17, 33, 34, and 35 represent additional figures between Cumberland, Md., and Washington, D.C.

The locomotives used on these trains were diesel electric types. Train Nos. 12, 17, 33, 34, and 35 had only coach cars drawn from the regular pool of intercity coaches which are streamlined and have reclining seats. Train Nos. 11–7 and 8 had food service and two days out of three had a vista-dome lounge. Trains 5 and 6 had dining facilities. Trains 5, 6, 11–7 and 12 handled mail and baggage as did train No. 8 until shortly before discontinuance. [None of the trains used self-propelled Budd RDC equipment commonly used on all trains which Baltimore and Ohio classify as commuter trains.]

The number of stops made along the route are indicated by the following table. Potomac presented these figures:

| Train No. | Stops, including Union Station | Average Distance Between Stops |
|---|---|---|
| 6 | 5 | 29.2 miles |
| 8 | 7 | 20.86 miles |
| 12 | 6 | 24.33 miles |
| 34 | 8 | 18.25 miles |
| 5 | 5 | 29.20 miles |
| 11–7 | 7 | 20.86 miles |
| 17 | 9 | 16.22 miles |
| 33 | 9 | 16.22 miles |
| 35 | 9 | 16.22 miles |

Defendant's figures are similar to the above.

## ARGUMENT

Baltimore and Ohio takes the position that each of the nine involved trains were intercity trains and their discontinuance was governed by section 401 of the Rail Passenger Service Act of 1970.[4] The fact that incidental commuter or short-haul service was rendered did not alter the basic nature of the service. They further contend that when the six criteria announced in 338 I.C.C. 318, and discussed later, are applied to the nine trains in question it can be seen that their nature is clearly intercity. To

---

4. . . . "Upon its entering into a valid contract (including protective arrangements for employees), the railroad shall be relieved of all its responsibilities as a common carrier of passengers by rail in intercity rail passenger service under part I of the Interstate Commerce Act or any State or other law relating to the provision of intercity passenger service: Provided, that any railroad discontinuing a train hereunder must give notice in accordance with the notice procedures contained in section 13a(1) of Title 49 . . . .". 84 Stat. 1334, 45 U.S.C. § 561.

support these positions they have submitted certain data, parts of which have been previously presented here.

The complainant and co-complainant take the opposing stand and maintain the service was commuter or short-haul and therefore defendant unlawfully discontinued the operation of these trains. One argument they present is that Baltimore and Ohio advertised their "Potomac Valley Service" and therefore by this and other acts, such as offering reduced fares, have established this as a commuter service. This was done in spite of the fact that five of the trains traveled distances in excess of 400 miles and four traversed 146 miles. The complainants further contend that the services should be segmented and considered in part intercity service and in part commuter short-haul service. Their position is that since commuter service was allegedly provided along with intercity service the two must be separated and considered as two different services.

## DISCUSSION AND CONCLUSIONS

This Commission has addressed itself to the issue presented herein on five previous occasions.[5] In each of these cases, the individual facts were the predominant element in arriving at the decision.

When the Commission first considered this problem six criteria were established to aid in the resolution of cases involving this issue. 338 I.C.C. 318 (1971). These are very broad in nature and can only become workable when facts are applied. These criteria are:

(1) The passenger service is primarily being used by patrons traveling on a regular basis either within a metropolitan area or between a metropolitan area and its suburbs;[6]

(2) The service is usually characterized by operations performed at morning and evening peak periods of travel;

(3) The service usually honors commutation or multiple-ride tickets at a fare reduced below the ordinary coach fare and carries the majority of its patrons on such a reduced fare basis;

(4) The service makes several stops at short intervals either within a zone or along the entire route;

(5) The equipment used may consist of little more than ordinary coaches;

(6) The service should not extend more than 100 miles at the most, except in rare instances; although service over shorter distances may not be commuter or short haul within the meaning of the exclusion.

These were structured around the statutory language of the Amtrak Statute, to wit: " 'Intercity rail passenger service' means all rail passenger service other than (a) commuter and other short-haul service in metropolitan and suburban areas, usually characterized by reduced fare, multiple-ride and commutation tickets, and by morning and evening peak period operations." 84 Stat. 1328.

The six criteria will now be examined and applied to each of the nine trains involved to determine the nature of each. The first criteria requires two determinations, to wit: (1) was the service *primarily* used by patrons on a *regular* bases? and (2) was this within a metropolitan area, or between metropolitan areas?

5. Penn Central Transp. Co. Discon, or Change in Serv., 338 I.C.C. 318 (1971); Chicago & E. I. R. Co. Discontinuance of Trains, 338 I.C.C. 714 (1971); Penn Central Transp. Co.—Status of Passenger Serv., 338 I.C.C. 621 (1971); Penn Central Transp. Co.—Status of Passenger Serv., 338 I.C.C. 660 (1971); and Penn Central Transp. Co.—Status of Passenger Serv., 338 I.C.C. 690 (1971).

6. It is recognized that in 338 I.C.C. 621 the Commission found ", . . . that 'commuter and other short-haul service' *could* reflect an operation extending beyond a metropolitan area to another metropolitan area . . ." 338 I.C.C. 637 (emphasis added), and modified the first criterion accordingly.

Statistics have been presented by both complainants and defendant representing the use of each train by commuters. Defendant's figures indicate that all the trains, with the exception of train No. 34, carried less than a majority of commuters. These figures differ from those presented by the Potomac Passengers Association. The reason for this difference has been discussed previously. However, in spite of the differences and regardless of whose figures are used, it becomes apparent that train Nos. 5, 6, 11–7, and 12 each carried less than a majority of its passengers or commuters. Train No. 8, according to Potomac, carried a slight majority of commuters but only 41 percent according to defendant. Train Nos. 17, 33, 34, and 35 each had substantial majorities by complainants' statistics, but not so by defendant's with the exception of train No. 34.

One point which needs to be made at this time is the fact that the first criteria calls for usage on a regular basis. Defendant's figures were compiled by using those passengers who made use of the special, discount commuter tickets available. This is certainly a good indication of regular usage since the special tickets were designed to save money for the multiple ride user, but to be too costly for an occasional traveler. For example, a one-way coach between Washington, D.C. and Martinsburg, W. Va. was $4.50 prior to discontinuance. A ten trip ticket, good for 6 months, was $36.00, an unlimited use weekly was $16.00 and an unlimited use monthly ticket was $57.75. Taking the ten trip-6 month ticket it can be seen that one saves $.90 each way by use of this ticket and additionally has 6 months to make a round trip 5 times. This is done at a total savings of $9.00. Certainly, anyone who would travel on a regular basis between Washington and Martinsburg would take advantage of this substantial savings. The savings under the other two plans are even more substantial. By the same token, an occasional user would not profit by buying a weekly or monthly ticket. It might be profitable to purchase the 10 ticket if five trips are planned during the 6 months. However, this latter traveler would have to be considered an occasional traveler and not on a regular basis as is dictated by the first criterion.

It must be concluded, therefore, that all trains, except train No. 34, were not primarily used by commuters on a regular basis. This conclusion is arrived at by giving full credence to complainant's figures which represent occasional travelers between Martinsburg and Washington, but the fact remains that the passengers were not primarily regular commuters.

The second determination under criterion one is whether or not Cumberland, Md. constitutes a suburb of the Washington, D.C. metropolitan area. Cumberland is 146 miles from Washington, D.C. and while the metropolitan area is expanding it is impossible to say it has gone this far. Cumberland does not appear on maps of Washington, D.C. and vicinity. See Rand McNally, Road Atlas (1972) and furthermore the state of West Virginia is not associated with the Washington, D.C. metropolitan area. The situation here is similar to the case of Chatham, N. Y., where the Commission ruled that town was not part of New York City's metropolitan area, 338 I.C.C. 660 (1971). There are no facts in the present case which would warrant a different conclusion.

There is, of course, no issue that Chicago, Ill., Akron, Ohio, and Cincinnati, Ohio, are in any way part of the Washington, D.C. metropolitan or suburban area.

As was pointed out in footnote number 6, service *could* fall within the Amtrak exclusion even if the operation extended beyond a metropolitan area to another metropolitan area. In light of the discussion above, it is apparent that all cities involved are outside the Washington, D.C. metropolitan area. This factor *by itself*, however, is certainly not sufficient to warrant a finding that a particular service is commuter or other short-haul in nature. Therefore, the record

seems to indicate that this additional facet of criterion (1), the "between metropolitan areas" question, is not in issue in the case now before us, as compared with the factual situation that was before the Commission in 338 I.C.C. 621. Our analysis will now extend to the other criteria involved herein.

The Commission's second criterion, as contained in section 102(5) of the Rail Passenger Service Act of 1970, requires that the service usually be characterized by morning and evening peak period operations. Of the nine trains considered herein only two could be said to operate at a peak period. Train No. 5 departs Washington at 4:40 p. m. daily, while train No. 34 arrives in Washington at 9:12 a. m. daily. However, the involved services must be considered in their totality. Consideration of whether a particular service is commuter or other short-haul cannot be given on a train-by-train basis. In this case three distinct services are involved; between Washington, D.C., on the one hand, and, on the other, Cumberland, Md., Chicago, Ill., and Akron, Ohio. Only that service operating between Washington, D.C. and Cumberland, Md., has the remotest possibility of meeting the general description of commuter and other short-haul service. Only one of these trains, train No. 34, could be considered as operating at a peak hour. The failure to provide peak hour service between Washington, D.C., and Cumberland, Md., in the evening indicates a lack of design for use by commuters. Consequently, we cannot find that the peak period criterion has been met.

All of the trains involved herein honored reduced fare tickets between points east of Cumberland and Washington, D. C. The question remaining is whether a majority of the patrons used this fare basis. As discussed above Baltimore and Ohio submitted figures which showed less than a majority patronage on a reduced fare basis with the exception of train No. 34. Potomac's figures represented all passengers traveling between Martinsburg and Washington and also between Cumberland and Washington. These two letter figures included full-fare passengers as well as reduced-fare.

The Commission has called for a majority of the passengers to be riders on a reduced fare basis. This is not the case with eight of the trains involved herein. The one exception, train No. 34, did carry over 60 percent commuter ticket passengers. This is the only train which satisfies the third criterion.

Fourth, the service must make several stops at short intervals. The previous chart shows the number of stops for each train and the distance between them. None of these figures could be considered the same as those usually associated with commuter service. Defendant presented a comparison of these numbers with those of the services it considers commuter. The average distance between stops for its train Nos. 37, 38, 39, 40, 51 and 52 was 6.4 miles as compared with 25.1 miles for the nine trains involved in this proceeding. The nine trains, therefore, can not be considered "commuter or short-haul" and fail to satisfy this criterion.

The equipment requirement of criterion five is not satisfied by any of the trains herein. The equipment used has been discussed previously and none of it comes within the limits of that usually associated with commuter service trains.

The last criteria sets a mile limit on the service at 100 miles except in rare instances. The nine trains here range from 146 miles to 770; none of them, therefore, come within the limit imposed by this Commission. Furthermore, there are no rare circumstances here which would warrant an exemption to the standard.

Taking the six criteria together there is no train which satisfies each of the six nor is there one train which satisfies enough of the criteria to find it a "commuter" service train in spite of certain "intercity" service characteristics. This conclusion is arrived at in light of the fact that train No. 5 leaves Washington

at 4:40 p. m. which is during the peak of the afternoon "rush" hour. Train No. 5 is an "intercity" train operating between Washington, D.C. and Chicago, Ill., a distance of 770 miles. Train No. 34, furthermore, arrived in Washington, D.C. at 9:12 a. m. which is during the peak morning hour. In addition the majority of its passengers were commuters. This train, however, originated at Cumberland, Md., a distance of 146 miles from Washington. This is a case where an "intercity" train operated near a metropolitan area at a time which was convenient to those commuting into the city. The basic nature of this service, however, was "intercity" and not "commuter or other short-haul." No unusual circumstances exist here to extend the 100 mile limit.

The complainants maintain that while the entire service is in the nature of "intercity" service, there is a portion thereof which is commuter in nature. They argue that the commuter portion must be segmented from the over-all service and considered separately. This argument does not, however, hold up in light of Congressional intent in passing the Amtrak Statute nor in past Commission policy regarding these cases.

Complainants point out that certain legislative history has been taken out of context in determining that Amtrak never intended to segment a service. The portion which particularly is in dispute is the discussion between Senators Hartke, Goodell and Prouty.[6] Upon examination of the enlarged portion of this conversation, which co-complainant presented in their brief, along with other portions of the legislative history, it becomes obvious that Congress never intended to segment incidental commuter service from intercity service and consider it as commuter service alone. The

language is implicit, to wit: "an intercity train which incidentally happens to pick up commuters nevertheless would be part of the system [i. e. intercity]."

This refers to the exact case to be decided herein. These nine trains were all intercity. They incidentally picked up passengers commuting to and from Washington, D.C. Their basic nature, however, remained "intercity". Any intercity train approaching a metropolitan area could be held to be commuter in nature as soon as it came within 100 miles of the city if co-complainant's position is adopted. It was not the intent of Congress to include this service in the commuter service exemption and that position will not be adopted by this Commission.

The Commission has, in every case of this type before it, considered the entire service and has not segmented the service. Co-complainant argues that on previous occasions the Commission has allowed segmentation. This is true; however, this was never done in connection with the Amtrak Statute but rather with Section 13a(1) of the Interstate Commerce Act. 72 Stat. 571, 572, 49 U. S.C. § 13a. The pertinent part of that section reads, "[a] carrier or carriers subject to this part, if their rights with respect to the discontinuance or change, *in whole or in part*, of the operation or service of any train . . . are subject to any provision of the constitution or statutes of any State . . . may, but shall not be required to, file with the Commission . . . (emphasis added). There is, therefore, a mandate from Congress to allow discontinuance of all or part of a service pursuant to section 13a(1). No such mandate appears in the Amtrak Statute. In fact as can be seen from the discussion above Congress did not intend to segment serv-

6. The following quotation was made to Senator Hartke by Senator Prouty as part of a debate in which Senators Hartke, Goodell, and Prouty were discussing the proposed Amtrak Statute:
"Mr. President, I think, in answer to the question of the Senator from New York an intercity train which incidentally happens to pick up commuters nevertheless would be part of the system. I do not think there is any doubt of that."
Congressional Record, May 5, 1970, p. S 6666.

ice. The position against segmentation in Amtrak cases will remain the policy of this Commission.

The nine trains, therefore, provided "intercity" service and not "commuter or other short-haul" service and come under the jurisdiction of the National Railroad Passenger Corporation. The proceeding before us must be dismissed for lack of jurisdiction.

An appropriate order will be entered.

Commissioner Tuggle did not participate.

COMMISSIONER GRESHAM, with whom COMMISSIONER O'NEAL joins, dissenting in part:

I wholeheartedly agree that trains Nos. 5, 6, 8, 11–7, 12, 17, 33, and 35 were of an intercity nature. But I believe train No. 34 clearly fell within the statutory category of commuter or other short-haul service in metropolitan and suburban areas which is usually characterized by "reduced fare, multiple-ride and commutation tickets, and by morning and evening peak period operations."

Where the report here misses the mark, I respectfully submit, is in apparently confusing this statutory language with the six criteria we laid down in Penn Central Transp. Co. Discon. or Change in Serv., 338 I.C.C. 318, 326 (1971) (hereinafter called the *"criteria case"*). Ignored is the fact that in the *"criteria case"* we said that commuter and other short-haul service would "likely" include "some" or all of the features in the six criteria. One might go so far as to say that logically implicit in the two quoted words is that it might even be possible for a train to be of a commuter or other short-haul nature and have none of these features. Thus, these criteria a fortiori are extremely flexible and elastic, not rigidly binding. And, while I believe—contrary to the decision of this Commission in Penn Central Transp. Co.—Status of Passenger Service, 338 I.C.C. 660 (1971) (the New York City—Chatham, N. Y. case)—that the service involved there was probably of the nature of commuter or other

short-haul service, I do agree with the statements in that report that these criteria are merely "to assist in the definition of 'commuter and other short-haul service'" but that "[o]ur first recourse, however, must to be to the language of the statute itself." 338 I.C.C. at 667.

The statute does *not* say commuter and other short-haul service is that "used on a regular basis within a single metropolitan area or between a single metropolitan area and its suburbs, or between two metropolitan areas." I surely agree with the majority that service between two metropolitan areas is not involved here. Yet by adhering so literally to every crossed "t" and dotted "i" of our original unexpanded first criterion the report would otherwise twist the statutory language in the manner indicated in the first portion of the language set forth in quotation marks above.

In going further, the majority says that train No. 34 satisfied the third criterion but not the second. Of the six criteria, only the second and third (with a minor exception in the third) flow forth from the cool, clear waters of the language of the statute itself. But the interpretation in the report of the "peak period operations" portion of the statute and the application there of the other criteria have muddied those waters. It is beyond my comprehension why a prerequisite to a finding that train No. 34 was of a commuter or other short-haul nature is that it must have had a clear counterpart operating in the peak evening period. Train No. 34, as the majority indicates, operated at a peak morning hour. And that is good enough for me to find that it fitted this statutory phase of commuter service.

The minor exception in our third criterion to which I have referred above as not being in the statute is that a majority of the riders should do so on commutation or multiple ride tickets. This is, of course, no more than icing on the cake of the statute. But it is a characteristic which everyone, including even the defendant and the majority, agrees

was part of the trappings of train No. 34. And this entire Commission, with one member not participating, *unanimously* stated in the *"criteria case"* at 338 I.C.C. 325:

> \* \* \* it is our opinion that, for trains *obviously* to fall within the commuter and short-haul exclusion, they not only would honor multiple-ride tickets but that, moreover, the *majority* of those riding the train would do so on that reduced fare basis. [emphasis mine]

The remaining criteria with which the report here partially attempts to scrap the commuter and other short-haul nature of train No. 34 do not emanate from the precise statutory language. The statute says nothing about such service entailing several stops at short intervals (criterion 4). It says nothing about the type of equipment that should be used (criterion 5). And it says nothing about a mileage limitation (criterion 6). Indeed, it would seem that this last is avoided.

The Congressional description of "commuter and other short-haul service" is identically the same as our definition of "suburban passenger service" in our Intercity Rail Study with the all-important deletion of our 75-mile limitation and with no replacement of it with any mileage limitation at all. (Please see the discussion at 342 I.C.C. 26). Congress must have done this deliberately. I believe that Congress did not want this type of service to be considered by any means *only* suburban service, as essentially would be required by our sixth criterion and by our original first criterion. And I believe this Commission must perforce agree with this conclusion since it found in essence in the *"criteria case,"* 338 I.C.C. 318 (where the service was between Boston, Mass., and Providence, R. I.), in a *Penn Central* case at 338 I.C.C. 621 (where the involved train service was between Harrisburg, Pa., and Philadelphia, Pa.), and in another *Penn Central* case at 338 I.C.C. 690 (where the involved train service was between Philadelphia, Pa., and New York, N. Y.) that the involved services were of the nature of "commuter and other short-haul service." Apropos of this, I am, regretfully, completely unable to embrace warmly the rather unique position of this Commission—as evolved from this and other cases cited in the report—which seems to be that to fit the description of commuter and other short-haul service a train *in practicality* should always operate (1) between a single metropolitan area and its suburbs or (2) between two metropolitan areas. I assume what this means is that any service which falls "between" these two ends of the pole of statutory interpretation must virtually willy-nilly be *intercity* service!

Finally, regarding the arguments raised respectively by the complainants and the majority here as to segmentation of service and as to the essential question being whether the total *service* is intercity or commuter is not whether a single *train* is intercity or commuter, I emphasize that what we are dealing with is the type of service provided by a *particular* train. (In this connection please compare the quotation in the majority's footnote 7 where Senator Prouty spoke of a *single* train, not of the overall service between points.) We cannot segment a train or the service it provides in determining its nature. But if the total service of a particular train meets more of the points in the statutory description of commuter and/or other short-haul service rather than of intercity service —as did that of train No. 34—then that, of course, is what it is.

## ORDER

At a General Session of the INTERSTATE COMMERCE COMMISSION, held at its office in Washington, D. C., on the 25th day of June, 1973.

Finance Docket No. 26689

MAVIS KENNEDY v. THE BALTIMORE AND OHIO RAILROAD COMPANY

Upon consideration of the record in the above-entitled proceeding, the report of the Commission appearing at 342 I.

C.C. 19, the order of The United States District Court for the District of Columbia dated April 25, 1973, referring to this Commission the issue as to whether certain trains of The Baltimore and Ohio Railroad Company provide "intercity" or "commuter or other short-haul" service, the order of the Commission, dated April 27, 1973, vacating the order of the Commission dated January 26, 1972, and reopening the proceeding, and the briefs submitted by Mavis Kennedy, Potomac Passengers Association and The Baltimore and Ohio Railroad Company; and the Commission, on the date hereof, having made and filed a report containing its findings of fact and conclusion thereon, which report is hereby referred to and made a part hereof:

*It is ordered,* That the proceeding be, and it is hereby, dismissed, for lack of jurisdiction.

By the Commission.

ROBERT L. OSWALD

(SEAL)          Secretary

NOTE: This decision is not a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.